745 A.2d 1054

**Christa LAZNOVSKY**

v.

**Frank LAZNOVSKY.**

**No. 65, Sept. Term, 1999.**

Court of Appeals of Maryland.

Feb. 11, 2000.

Keith R. Anderson (Griswold, Anderson & Lee, P.A., on brief), Easton, for Petitioner.

Frank T. Laznovsky (French, Jarashow, Burgmeier & Smith, P.A., on brief), Annapolis, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Petitioner, Christa Laznovsky, asks us to review a decision of the Court of Special Appeals that vacated an order of the Circuit Court for Talbot County awarding her custody of the

minor children of her and respondent, Frank Laznovsky. She presents two questions:

1. Does a party seeking an award of sole custody place their mental health at issue, so as to require the disclosure of privileged mental health records?

2. Did the Court of Special Appeals err in requiring the disclosure of wife's privileged mental health records?

## I. Facts

The parties were married in 1985. They resided in New York for two years, then moved to Talbot County in 1987. Petitioner was, at the time of the marriage, a paralegal; respondent was then, and is now, an attorney. At the time of their marriage, petitioner had a history of psychiatric treatment. Shortly after the start of their marriage, petitioner, at respondent's request, continued in psychiatric treatment. In 1990, the parties had a son. They separated in 1991, reconciled in 1993, and in that year had another son. During the summer and fall of 1994, both parties saw a psychiatrist jointly, Dr. Richard Greenbaum. They separated again in 1995, with respondent moving to Baltimore and living with his secretary and petitioner remaining in the Talbot County home with the children.

At the time of their 1995 separation, they prepared and executed an agreement that, as relevant here, provided for joint guardianship, care and custody of the children, but with petitioner to have primary residential care of the children. Thereafter, petitioner filed a complaint for divorce, and then an amended complaint for divorce in which she sought sole custody of the children. In his answer to petitioner's amended complaint, respondent sought sole custody of the children. Accordingly, by the time of the hearing below, both parties sought sole legal custody of the children.

At the trial level, respondent sought discovery of treatment records relating to petitioner's past mental health treatment. At a deposition, respondent attempted to question petitioner about her past mental health treatment. She refused to

answer the questions, invoking the psychotherapist-patient privilege contained in Maryland Code (1974, 1998 Repl.Vol.), section 9–109(b) of the Courts & Judicial Proceedings Article.[1] Respondent then filed a Motion to Compel Discovery. Petitioner answered with a Motion for Protective Order, and a Motion to Quash the subpoenas directed to her past and present treating mental health psychiatrists, psychologists, and counselors.

The circuit court denied, in part, respondent's Motion to Compel Discovery, initially reserving, however, the issue of whether it would permit subpoenas, which respondent had caused to be issued to certain of petitioner's health care providers, to be utilized to require the production of the

---

1. Section 9–109(b) provides in relevant part:

   § **9–109. Communications between patient and psychiatrist or psychologist.**

   . . . .

   (b) *Privilege generally.*—Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or his authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder.

   . . . .

   (d) *Exclusion of privilege.*—There is no privilege if:

   (1) A disclosure is necessary for the purposes of placing the patient in a facility for mental illness;

   (2) A judge finds that the patient, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court and the issue at trial involves his mental or emotional disorder;

   (3) In a civil or criminal proceeding:

   (i) The patient introduces his mental condition as an element of his claim or defense; or

   (ii) After the patient's death, his mental condition is introduced by any party claiming or defending through or as a beneficiary of the patient;

   (4) The patient, an authorized representative of the patient, or the personal representative of the patient makes a claim against the psychiatrist or licensed psychologist for malpractice;

   (5) Related to civil or criminal proceedings under defective delinquency proceedings; or

   (6) The patient expressly consents to waive the privilege, or in the case of death or disability, his personal or authorized representative waives the privilege for purpose of making a claim or bringing suit on a policy of insurance on life, health, or physical condition.

records to respondent. The trial court, in its ruling, noted that the scope of the subpoenas was limited to current records in the possession of the providers that "are reasonably related to matters addressing [petitioner's] current parental fitness for custody of the Parties['] two minor children." As to these records, it directed that the post–1994 records be delivered to the court under seal for the court's inspection *in camera,* with access initially denied to all parties. It also directed that no other documents listed on the subpoenas needed to be produced at that time. Additionally, it found that petitioner had not waived the psychiatrist/psychologist-patient privilege by attempting to obtain sole custody of the children.[2]

Respondent noted an interlocutory appeal in respect to that portion of the trial court's ruling precluding discovery of all of the wife's mental health records. In the meantime, petitioner had complied with the trial court's order by submitting the required records under seal with the trial court. Respondent's interlocutory appeal was dismissed by the Court of Special Appeals as premature.

Approximately a year later,[3] the trial court, as we have indicated, modified its previous order and required the production of all of the petitioner's mental health records from January of 1995 forward. Petitioner produced those records several days before the hearing.

A separate Motion for Psychological Evaluation was filed by respondent after the trial court's initial ruling that certain of petitioner's records be submitted *in camera.* Petitioner responded to the motion for a psychological examination of the family by requesting it be denied, because, in her opinion, the trial court had already ordered the production of sufficient

---

**2.** Prior to the hearing on the merits, the trial court directed that all of the post–1994 mental health records of petitioner, not only those the trial court had examined *in camera,* be produced to respondent. Accordingly, shortly before the merits hearing, respondent had access to four years of petitioner's mental health records.

**3.** The hearing on the merits had been delayed by the illness of respondent's counsel.

records, which made a further evaluation unnecessary. She also proffered that, should a review of the records not be sufficient, the trial court had the inherent power to require another evaluation. She stated in her answer:

1. This matter has previously been resolved pursuant to Plaintiff's Motion for a Protective Order ... in which this Honorable Court ordered that certain records requested by the Defendant and pertaining to Plaintiff's mental health be produced for review, in camera. If, based upon a review of those records, this Honorable Court deemed it necessary and appropriate to require an independent medical/psychological evaluation, same would be forthcoming, pursuant to this Court's inherent ability to so order.

The trial court denied the Motion for Psychological Evaluation. After reviewing the records it had required to be submitted *in camera*, the trial court did not revisit the issue of a psychological evaluation, nor did respondent either then, or after the trial court had reviewed the initial records and ordered *all* of the post–1994 records to be furnished to respondent, renew his request for such an evaluation.

At the conclusion of the merits hearing, the trial court awarded sole legal custody of the children to petitioner, saying: "Sole legal custody is awarded to Mrs. Laznovsky primarily because both of the parties testified that they are unable to communicate." Respondent appealed that decision (along with several other rulings of the trial court) to the Court of Special Appeals.[4]

---

**4.** Respondent presented the following questions to the Court of Special Appeals:

I. Whether a father in a custody dispute is denied due process under the Fourteenth Amendment to the United States Constitution, where he is precluded from discovering evidence relating to his wife's mental condition and credibility, the non-disclosure of which would undermine confidence in the outcome of the trial.

II. Whether a wife in a custody dispute that has received psychological counseling and treatment for emotional problems during the entire course of the couple's 12 year marriage from eight different psychologists, that alleges that she is a fit and proper person to have the sole care and custody of the couple's two minor children for the

As relevant to the issues presented to us, respondent asserted to the Court of Special Appeals that petitioner, by claiming to be a fit and proper person to have sole legal custody of the children, had placed her mental condition at issue and thus had waived the psychiatrist/patient privilege created by Maryland Code (1974, 1998 Repl.Vol.), section 9–109 of the Courts & Judicial Proceedings Article. The Court of Special Appeals agreed and, in a 2–1 decision, reversed the circuit court on that issue. It held, in relevant part, that as to the privilege granted in respect to mental health treatment records by

---

purpose of changing the couple's separation agreement which provides for joint custody of the minor children, in order to facilitate her move with the children to New York, has put her mental condition in issue.

III. Whether the best interests of two minor children, ages seven and three, would be best served by the Circuit Court ordering a current psychological examination of the parties to a custody dispute relating to their fitness to serve as the custodial parent of the two minor children.

IV. Whether [the trial court] abused his discretion by awarding sole custody of the couple's two minor children to the mother, when he failed to address or apply the requisite factors or criteria to be considered before making a custody determination.

V. Whether [the trial court] abused his discretion by awarding sole custody of the couple's two minor children to the mother in view of overwhelming evidence that it was in the best interests of the children that their custody be awarded to the father.

[VI.] Whether [the trial court] abused his discretion by awarding indefinite alimony to a self-supporting 37 year old paralegal that earned $30,000 annually, where the husband was 50 years old and where the parties have lived separate and apart for five (5) of the thirteen (13) years they had been married.

When the Court of Special Appeals rephrased respondent's issues, it left out questions I, IV, and V altogether. Moreover, it did not address either of those issues in its resolution. Upon remand, the Court of Special Appeals will, of necessity, have to answer questions I, IV, and V, except to the extent those decisions may await the remand to the trial court for independent psychological evaluations consistent with the judgment of the Court of Special Appeals. Petitioner did not present the issue of the Court of Special Appeals' ruling on the necessity of an independent psychological review to us in her Petition for Writ of Certiorari. *See generally Walston v. Sun Cab Co.,* 267 Md. 559, 298 A.2d 391 (1973). Additionally, respondent did not file a cross-petition in respect to the Court of Special Appeals' determination in respect to indefinite alimony.

section 9–109(b)[5] and by Maryland Code (1974, 1994 Repl.Vol., 1998 Cum.Supp.), section 4–307 of the Health–General Article, that:

> These rights must be balanced against the best interests of the children in a contested custody case. Fitness is the dominant consideration in a custody case; the mental and emotional state of a parent is most material and relevant. . . .
>
>  . . . .
>
>  . . . [W]ide latitude must be given in discovery to allow a litigant to develop his or her case. The trial court's failure to allow the appellee to adduce the status of the appellee's mental health, her diagnosis, prognosis, and treatment, and its effect on her ability to parent the children and serve as the sole custodial parent, constituted an abuse of discretion. While it is rare to reverse a trial court on a discovery ruling, where a party's case was prejudiced by the failure to produce records that would clearly develop a relevant line of cross-examination and the basis for an expert's opinion as to the fitness of a party to be a custodial parent, it constituted reversible abuse of discretion.[6] [Footnote omitted.]

We disagree and reverse the judgment of the Court of Special Appeals.

---

**5.** The Maryland privilege, by its terms, extends only to records and communications dealing with "diagnosis and treatment." *See also Bieluch v. Bieluch*, 190 Conn. 813, 817, 462 A.2d 1060, 1063 (1983) (holding that court-ordered evaluations did not constitute diagnosis and treatment, and, moreover, that the father was not acting as an agent for the children who had been treated; therefore, his telephone communications with the psychiatrist were not encompassed within the Connecticut privilege statute).

**6.** In footnote 1 of the majority opinion of the Court of Special Appeals, the author attempted to distinguish one of that court's recent opinions, *In re Matthew R.*, 113 Md.App. 701, 688 A.2d 955 (1997), by stating it did not apply because in the present case it was petitioner who was seeking a change in custody. The court was partially incorrect as to the facts. Both parties, petitioner and respondent, were seeking sole legal custody.

## II. Privilege

In this review, we must consider whether a statutory privilege is applicable in this custody case. In that process, we must consider the balancing that occurs, or may occur, when a legislatively created privilege appears to conflict with a court-created standard for determinations in custody matters. Our first step is to look at the privilege statutes. What is now Maryland Code (1974, 1998 Repl.Vol.), section 9–109(b) of the Courts & Judicial Proceedings Article,[7] was initially adopted as 1966 Maryland Laws, Chapter 503. Senate Bill 118, the bill which became Chapter 503, as initially filed and presented, did not include any exception permitting a trial court to compel disclosure of mental health records in child custody cases, although it did have other exceptions, including one for when a person places his or her mental condition in issue. The child custody exception was amended into Senate Bill 118 prior to its passage. As initially *enacted*, it contained specific language that permitted a trial judge in a custody proceeding to compel the disclosure of otherwise privileged mental health records, if the judge believed that such disclosure was "necessary to a proper determination of the issue of custody." [8] This prior exception is in accord with the position now taken by respondent and the majority opinion of the Court of Special Appeals below: that if a trial judge, in the exercise of his or her discretion, determines that such records are necessary in order to determine custody matters, then the privilege may be deemed to be overcome by the trial court, on its own motion or on motion of an opposing party.

Since the original enactment of the law, additional exceptions have been added. In 1976, in House Bill 1, the Legislature created another exception:

---

7. From this point forward, any reference to section 9–109(b) is to Maryland Code (1974, 1998 Repl.Vol.), section 9–109(b) of the Courts & Judicial Proceedings Article, unless otherwise indicated.

8. This was codified to Maryland Code (1957, 1971 Repl.Vol.), Article 35, section 13A, which was superseded by section 9–109(b).

(II) After the patient's death, his mental condition is introduced by any party claiming or defending through or as a beneficiary of the patient[.]

1976 Md. Laws, Chap. 363. In 1981, another exception was clarified when House Bill 766 was enacted, specifying that the privilege is waived when authorized representatives of the patient make claims against certain mental health care providers. *See* 1981 Md. Laws, Chap. 236.

There has been only one instance where an exception, previously a part of this privilege statute, has been removed or repealed. It relates to the issue squarely before this Court. The exception to the privilege for child custody matters stayed in the law until 1977. At that time, Senate Bill 90 was passed, repealing and reenacting section 9–109 of the privilege statute. Its title stated that it was "F[or] the purpose of eliminating an exception to the privilege to refuse to disclose communications relating to a patient's mental or emotional disorder as related to a psychiatrist or a psychologist." 1977 Md. Laws, Chap. 685. Senate Bill 90 removed the exception permitting trial judges to compel disclosure in child custody matters. This was the only change provided in Senate Bill 90. The child custody exception was not, therefore, inadvertently omitted as part of some general attempt at recodification. It was specifically repealed. The repeal of the exception was an essential element, and the only purpose, of the bill. The legislative history of Senate Bill 90 confirms that its purpose was to ensure the confidentiality of psychiatrist-patient treatment communications and records, *even in child custody cases*. That legislative history permits no other reasonable inferences. The bill file, for instance, includes a Fiscal Note from the Department of Fiscal Services noting that:

This bill removes from existing law concerning a patient[']s mental disorder as related to a psychiatrist or psychologist, an exception to the privilege to refuse disclosure of communications between patient and physician when custody of children is involved.

Additionally, handwritten summaries of the bill's effects are included in the bill file:

[Section] 9–109(b) Cts. & Judicial Proceedings provides for the general privilege to refuse to testify as to communications between a patient and his psychiatrist.

The single exception to this privilege is in [section] 9–109(c) which provides that a judge may compel disclosure in custody cases. SB 90 attempts to delete this exception.

Purpose for this bill is to eliminate circumstances where psychiatrists are called into court, thereby eliminating the therapeutic relationship.

Examples are: patient with severe mental disorder and collateral custody battle may be in position to realize that psychiatric relationship will be disclosed; thereby closing possibility of further treatment.

Dr. Jonas Rappeport, Chief Medical Officer advises that when [General] Assembly enacted psych. privilege in 1966, Model Connecticut law upon which this [section] is based did not have this exception.

Judge Liss stated in letter re 90 that to compel disclosure is "not fair either to the professional person involved nor to his patient, who should be able to speak frankly without fear of disclosure."

The National Organization for Women, in a position letter to the committee, dated January 27, 1977, stated in relevant part:

The National Organization for Women supports Senate Bill 90, concerning Psychiatrist—Patient Privilege.

The marital discord which precedes divorce and custody actions is often of such an emotional nature as to lead one or both parties to seek professional psychiatric counselling in attempting to restructure their lives. It is the dependent spouse, more often the wife, who faces the greater changes during this period, and who views the prospects of economic and emotional independence perhaps for the first time. The desire for psychiatric consultation during this transition is understandable, and it is our feeling that such efforts should

not be used against one in custody proceedings, as they may be now.

It is furthermore, deleterious to the therapeutic relationship, which must have as its basis trust and confidentiality, to know that a judge may compel disclosures of a most intimate nature, and that such disclosures may affect the outcome of a custody case.

More important, the Chairman of the Judicial Proceedings Committee, Senator J. Joseph Curran (now Attorney General of Maryland), addressed a letter dated January 20, 1977, to Judge Anselm Sodaro of the Supreme Bench of Baltimore, which invited comment from other judges. In his letter, Senator Curran stated in relevant part:

At the Committee hearing on this bill, questions were posed as to how often in child custody cases does a judge compel disclosure. We understand the need to encourage a full and frank discussion between the patient and the psychiatrist, and want to enact laws to meet this end. However, I would very much like to receive opinions as to how often this information is needed in custody cases.

Judge Solomon Liss, then a member of the Court of Special Appeals, wrote a letter, dated January 25, 1977, to the committee, replying, in relevant part that:

[I]n the eight years I spent on the trial bench, I never found it necessary to compel the testimony of a psychiatrist or psychologist in a child custody case. Of course, those of us on the Supreme Bench . . . had available the services of . . . Dr. Jonas Rappeport and his staff. . . .

. . . I would be reluctant to urge compelled disclosure except as a last resort. Such an edict is not fair either to the professional person involved nor to his patient, who should be able to speak frankly without fear of disclosure.

Judge Watts, replying to the letter from Senator Curran, stated in a letter dated January 26, 1977:

For three years I presided in the Domestic Relations Court of Baltimore City. During the present term I hear domestic cases regularly in addition to my normal case

assignment. On the basis of this experience, I can tell you that there have been very few occasions on which I have had to compel an individual to produce psychiatric information. In fact, I can recall only four or five cases where this was necessary. When an individual is under psychiatric treatment, he is usually willing to bring this information to the attention of the Court.

Dr. Jonas R. Rappeport also responded to Senator Curran by letter dated January 24, 1977, stating in relevant part:

As you know, I was involved in the development of the initial psychiatrist/psychologist privilege legislation and worked very strongly for its passage in the 60s. It was with reluctance that our committee of the Maryland Psychiatric Society accepted the child custody exception. However, because of general concerns about the entire concept of this special privilege, we recognized the need to go along with this amendment.

In practice, since the passage of this original legislation, the child custody exception has caused some hardships. Several colleagues have reported to me the extreme difficulty that they have in working with parents in psychotherapy when the parent is made aware of the fact that anything that they mention in the therapeutic sessions may be brought out in a custody proceedings if the judge feels that such information is germane to his decision. Just a few weeks ago I personally saw a patient for a consultation who currently has custody of his children and felt it necessary to warn him of the fact that anything that he told me might be revealed in court should the judge deem it necessary when and if there was an attempt to gain custody of his children by his former wife. As a result thereof he hesitated about accepting my recommendation for continued treatment with me although I am happy to report that he has accepted my recommendation for treatment and is seeing me. While his feeling was that he would have to take his chances, I have no way of knowing how much this threat of public exposure to the very sensitive psychiatrist/patient relationship will interfere with treatment. In the past I have known of one

patient who has elected not to have treatment in view of this particular problem. Several other psychiatrists have reported to me that they feel that this exception to the psychiatrist/patient privilege does prevent very needy parents, that is, people in need of psychiatric treatment, from obtaining it and, therefore, in fact may eventually place the children at a disadvantage. If their parents cannot be "cured", then the child continues to be exposed to an emotionally disturbed parent.

While I recognize that custody decisions are exceedingly difficult ones for the court to make in that the judge needs all the help that he can obtain under such circumstances, I believe that such help can be obtained from other sources. No matter how honestly and openly a psychiatrist subpoenaed into court to testify about his relationship with his patient may wish to be, we can clearly understand that he may not either present or even know all of the information that might be available to independent examiners.... [W]e believe we have served the court very well by having the same psychiatrist and psychologist examine all parties in question to custody battles and thereby have an opportunity for a very well balanced view of the situation.... [W]e feel that we are much more capable of rendering an unbiased, overall view of the situation and presenting recommendations that are truly in the best interest of the child than we might be able to do should we be involved with only one parent whether it be a long term therapeutic relationship or merely an evaluation.

For these reasons stated above I feel that the benefits to society of having confidential and privileged treatment available to troubled parents far outweighs the limitations placed upon the court by not having such information revealed against the parents' wishes.

It is clear to us that the Legislature was fully aware of the ramifications of the child custody exception amended into the statute during its original enactment. At the time the exception was repealed, with the information furnished and available to the Legislature through the proceedings of its commit-

tee, it is evident that they were being asked to consider the balancing of the interests in the psychiatrist/psychologist-patient privilege with the need of the courts to have such information in assessing the best interests of the children in custody cases.[9] The psychiatrist/psychologist-patient privilege prevailed as the Legislature elected to remove the exception that had theretofore permitted the courts to hold the privilege inapplicable in child custody cases. Thus, the Legislature balanced the interests and made the determination.

Of some interest is the importance of confidentiality in other mental health treatment privilege statutes in which the Legislature has not included any exceptions for child custody cases, although it has created other exceptions. Maryland Code (1974, 1994 Repl.Vol., 1998 Cum.Supp.), section 4–307(h)(1)(v) of the Health–General Article provides:

(h) ... (1) A health care provider shall disclose a medical record without the authorization of a person in interest:

. . . .

(v) In accordance with service of compulsory process or a discovery request, as permitted under § 9–109(d), § 9–109.1(d), or § 9–121(d) of the Courts and Judicial Proceedings Article, or as otherwise provided by law, to a court, an administrative tribunal, or a party to a civil court, administrative, or health claims arbitration proceeding. . . .

Subsection 9–109(d) of the Courts & Judicial Proceedings Article, relating to the psychiatrist-patient privilege, is the exception provision under the statute we address in the case at bar. Subsection 9–109.1(d) relates to the patient-psychia-

---

**9.** *Nagle v. Hooks*, 296 Md. 123, 126–27, 460 A.2d 49, 51 (1983), was a case concerning who would be qualified, as a representative of a minor child, to waive the psychiatrist/patient privilege in respect to such records relating to mental health treatment of the child in a child custody case pursuant to section 9–109(b). Commenting on the 1977 repeal of the child custody exception, the Court said: "That provision was eliminated by the legislature in 1977 ... for some unexplained reason, and is thus not the law today." *Id.* at 127, 460 A.2d at 51. Our current review of the legislative history surrounding the repeal, to a large extent, suggests the Legislature's intention in repealing the exception.

trist mental health nursing specialist privilege; subsection 9–121(d) relates to exceptions in respect to a licensed social worker-client privilege. In none of the other statutes is there a child custody exception. At the time of their enactment, the same concerns expressed at the time of the enactment of 1977 Maryland Laws, Chapter 685 were expressed. Section 9–109.1 was enacted as 1990 Maryland Laws, Chapter 300. The bill file for that enactment indicates that the position of the Maryland Nurses' Association was made available to the Legislature in a letter dated January 17, 1999. The association said, in relevant part:

This is a Patients' Rights bill to ensure that the communication between a client and a psychiatric mental health nursing specialist has the full protection of privileged communication.

The essence of this bill is not new. The precedent has been established in the following sections of the Annotated Code of Maryland (9–109) and (9–121)....

Passage of this bill would provide parity for clients of psychiatric-mental health nursing specialists with those of the other core mental health disciplines including psychiatrists, psychologists and social workers.

Currently, citizens in Maryland being treated by psychiatric-mental health nursing specialists have had their records accessed in judicial proceedings without their consent. To say this places these clients at a gross disadvantage is an understatement. All citizens seeking psychiatric-mental health treatment should be assured that their client/provider communications are equally protected under the law.

Even more relevant are some of the communications made available when section 9–121(d) was enacted by Senate Bill 420, just six years after the 1977 repeal of the child custody exception in section 9–109. 1983 Md. Laws, Chap. 531. The bill file contains several pertinent references. First, it contained the testimony of a licensed social worker, Torpley M. Richards, LCSW, which provided, in relevant part:

Several years ago a physician referred to me a man who was distressed by severe marital problems. This man and his wife had previously been in couples therapy but they had not been able to resolve their many differences. They decided to have a trial separation and to seek individual support during this difficult time. When Mr. A was referred to me for treatment, his wife, Mrs. A was referred to a psychiatrist.

One year later, Mrs. A decided to file for divorce. She asked for sole custody of the couples' three children claiming that Mr. A was "unfit" to have custody. Mrs. A's lawyer was well aware that at this time social workers are not protected by law for privileged communication. Mrs. A's lawyer could have questioned me directly about confidences shared with me by Mr. A, under oath, in a court of law, without Mr. A's permission. At the same time, Mrs. A enjoyed the protection of privileged communication. Fortunately for Mr. A, this case never came to trial.

In communications and testimony before the Senate Judicial Proceedings Committee, the same committee through which 1977 Maryland Laws, Chapter 685 had previously passed, other comments even more directly pointed out the importance of the privilege in child custody cases. A letter dated February 22, 1983, from the Administrator of the Family Counseling Services of Associated Catholic Charities, Inc., provided, in part:

The protection of privileged communication is especially important in cases of separation and divorce, contested child custody ... suits, and employers seeking information on employees. A typical example of the protection privileged communication provides follows:

A mother, who was concerned about the effects of a recent separation on her children, sought counseling with our agency. Her husband, who was fighting the terms of the divorce settlement, sought information from Associated Catholic Charities which would prove her incompetence as a parent. In fact, this mother was seeking to help her children, who were suffering as a result of the

adversarial position of their parents. If we had been required to give information to this husband, the wife would have left counseling, and the children would have continued to suffer.

For these reasons, Associated Catholic Charities supports SB 420.

There was additional testimony on behalf of Associated Catholic Charities, Inc., by Ms. Cheryl Lynch, dated February 24, 1983:

This confidentiality is important in establishing the trust necessary for the client to reveal personal information in order to receive help.

As a family service agency, Catholic Charities serves approximately 300 families a month through its Counseling Services. The protection of privileged communication is especially important in cases of separation and divorce, contested child custody, and employers seeking information on employees. People who are struggling with difficult or emotional problems have to know that they can speak freely to a counselor with the understanding that the information they disclose is held in confidence. From these private disclosures, many people find relief from their suffering and help in resolving their difficulties.

It is clear that the issue of whether there should be an exception from mental health privilege statutes for child custody cases has repeatedly been presented to the Legislature since 1977. In fact, the need for the privilege in child custody cases has been proffered to the Legislature as an important, special reason for the necessity of the privilege. The Legislature, by enacting these subsequent privilege statutes, has not created any exemption for child custody cases.

We emphasize again that we are not faced with a privilege statute that has always been silent as to whether a court could compel the production of otherwise confidential communications in child custody cases. The Maryland statute was originally enacted with a specific exception permitting a court to compel such information in such a circumstance, and that

exception remained intact for eleven years. In 1977, addressing the concerns of the mental health profession, the Legislature repealed that provision. The intention of the Legislature is clear. It made a public policy choice not to exempt child custody cases from the scope of the privilege, and has continued to preserve the privilege even in child custody cases in its enactment of other privilege statutes in the mental health area.

Additionally, Maryland Code (1974, 1994 Repl.Vol., 1998 Cum.Supp.), section 4–302 of the Health–General Article provides that:

(a) *In general.*—A health care provider shall:

(1) Keep the medical record of a patient or recipient confidential; and

(2) Disclose the medical record only:

(i) As provided by this subtitle; or

(ii) As otherwise provided by law.

Thereafter, there are several exceptions crafted in the Health–General Article. *See* Md.Code (1974, 1994 Repl.Vol., 1998 Cum.Supp.), §§ 4–305, 4–306, 4–307. None contain a child custody exception.

As is clear from the legislative history above, the Legislature knows how to craft exceptions to confidentiality privileges. Section 9–109 itself contains several exceptions, as do section 9–109.1 and section 9–110, which deals with the accountant/client privilege.

Maryland Code (1974, 1998 Repl.Vol.), section 5–609 of the Courts & Judicial Proceedings Article affords protection from causes of action for mental health providers when patients subsequently exhibit violent behavior, unless the provider "knew of the patient's propensity for violence" or the patient had indicated to the provider an intention to inflict injury on another. If the provider knows of the propensity, or the patient indicates the intent to injure another, the provider can only avail himself or herself of the immunity protection if he or she has done certain things, including informing appropri-

ate law enforcement agencies of the patient's propensities or intentions to inflict injury. That statute then provides:

(d) *Patient confidentiality.*—No cause of action or disciplinary action may arise under any patient confidentiality act against a mental health care provider or administrator for confidences disclosed or not disclosed in good faith to third parties in an effort to discharge a duty arising under this section according to the provisions of subsection (c) of this section.

*See also* Md.Code (1974, 1998 Repl.Vol.), § 9–112 of the Courts & Judicial Proceedings Article ("Privileged communications—News media."); *compare* section 9–105 (confidentiality of spousal communications) *with* section 9–106 (providing exceptions in criminal cases involving abuse of minors, and also providing that the privilege is waived if previously the spouse asserted the privilege and refused to testify against the other spouse in a spousal assault case).

Additionally, the Legislature, by a subsequent statute first enacted in 1987, has expressly exempted certain matters relating to reporting allegations of child abuse from the prohibitions against compelled disclosure of psychiatrist-patient diagnosis and treatment records. Maryland Code (1984, 1991 Repl.Vol., 1998 Cum.Supp.), section 5–704 of the Family Law Article (enacted as 1987 Maryland Laws, Chapter 635) provides in relevant part:

§ 5–704. **Reporting of abuse or neglect—By health practitioner** . . . .

(a) *In general.*—(1) *Notwithstanding any other provision of law, including any law on privileged communications,* each health practitioner, . . . acting in a professional capacity, who has reason to believe that a child has been subjected to:

(i) abuse, shall notify the local department or the appropriate law enforcement agency; or

(ii) neglect, shall notify the local department. . . . [Some

emphasis added.] [10]

There may well be other privilege statutes containing exceptions.[11] What is clear is that the Legislature knows how to create privileges, and how to create exceptions and how to repeal exceptions. Its decision to repeal the child custody exception at issue in the case *sub judice* was a clear policy statement.

When attempting to discern the intention of the Legislature in enacting a particular statute, we have recently said in *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 709 A.2d 1301 (1998):

"In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730, 731 (1986); *see also Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444, 697 A.2d 455, 458 (1997). Legislative intent generally is derived from the words of the statute at issue. "We are not constrained, however, by ... 'the literal or usual meaning' of the terms at issue." "Furthermore, we do not read statutory language 'in isolation or out of context [but construe it] in light of the legislature's general purpose and in the context of the statute as a whole.'" "The 'meaning of the plainest language' is controlled by the context in which it appears."

*Id.* at 807–08, 709 A.2d at 1303 (some citations omitted). We commented in an earlier case:

---

**10.** *But see* section 5–707 of the Family Law Article and its confidentiality provisions.

**11.** In the case *sub judice,* we are concerned with whether a statutory privilege can be asserted in a child custody case. We are not concerned with the issue of such privileges in a criminal case context. In *Goldsmith v. State,* 337 Md. 112, 129, 651 A.2d 866, 874 (1995), we stated: "[W]e recognize that the defendant's constitutional rights at trial may outweigh the victim's right to assert a privilege." There exist other cases in this state, and in other jurisdictions, concerning the assertion of the privilege in criminal cases that we do not here address.

When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed in the Annotated Code. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, *amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.*

... Thus, in *State v. One 1983 Chevrolet Van,* 309 Md. 327, 524 A.2d 51 (1987), ... [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." ... *See also Ogrinz v. James,* 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski v. Mayor and City Council,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987) (emphasis added).

In the case *sub judice,* the amendment during passage of the original bill that had inserted a child custody exception, the subsequent repeal of the exception, the failure to include child custody exceptions in similar statutes, and the legislative history of the various statutes indicates that the Legislature intended that there be no express exception to the privilege in child custody cases.

There is little case law on the exact issue presented here among our sister states. Several courts that have addressed the issue have dealt with exemption statutes similar to the exemption repealed in this state by 1977 Maryland Laws, Chapter 685. Accordingly, they do not sufficiently address the issue before us to be particularly helpful although we shall discuss cases from two of the states (Alabama and Louisiana)

to indicate the view contrary to the one that we adopt here. These states include Alabama, *Harbin v. Harbin*, 495 So.2d 72 (Ala.Civ.App.1986); Alaska, *In the Matter of D.D.S.*, 869 P.2d 160 (Alaska 1994) (exception for CINA cases); Louisiana, *Carney v. Carney*, 525 So.2d 357 (La.Ct.App.), *writ denied*, 530 So.2d 88 (La.1988); Michigan, *LeGendre v. Monroe County*, 234 Mich.App. 708, 739 n. 18, 600 N.W.2d 78, 94 n. 18 (1999) (sex discrimination case in which the child custody exception was mentioned); Missouri, *In re Marriage of Daneshfar*, 953 S.W.2d 95 (Mo.Ct.App.1997); *In Interest of S.J.*, 849 S.W.2d 608, 610–11 (Mo.Ct.App.1993) (exception in termination of parental rights case); Texas, *Smith v. Gayle*, 834 S.W.2d 105 (Tex.App.—Houston [1st Dist.] 1992). The exception language from the other states' cases are similar to the language of Maryland's repealed exception. For example, the Alabama statute provides: "There is no privilege . . . in a child custody case in which the mental state of a party is clearly an issue and a proper resolution of the custody question requires disclosure." Ala. R. Evid. 503(d)(5). The language of the exception formerly contained in section 9–109 stated: "the presiding judge of a court of record may compel such disclosure in cases involving the custody of children, if, in his opinion, such disclosure is necessary to a proper determination of the issue of custody." 1966 Md. Laws, Chap. 503. Overall, few states have resolved the issue presented in respect to the psychiatrist/psychologist-patient privilege in child custody cases. Moreover, we have found in our research no case in which a foreign state's legislative body has specifically balanced the competing interests of the needs of proper mental health and the needs for courts to have such information in child custody matters, by first enacting a child custody exception and then repealing it, in order to ensure confidentiality of mental health records.

In our review of the law of other states, we look also to the cases in respect to the related physician-patient privilege. We start our review of the foreign authorities by considering privilege cases in respect to petitioner's first question: "Does a party seeking an award of sole custody place their mental

health at issue, so as to require the disclosure of privileged mental health records?"

The other states are divided on the issue. Those that answer the question affirmatively generally follow the Alabama approach. Those that answer the question negatively generally follow the Florida approach.

As we have indicated above, there is a child custody exception in Alabama's privilege statute. It is couched in terms of applying where a party's mental state is clearly an issue. In *Thompson v. Thompson*, 624 So.2d 619, 620 (Ala.Civ.App. 1993), the father had alleged that the mother was "not fit" to be a parent because she was an alcoholic. The intermediate appellate court held that the father's allegation alone was sufficient to place the mother's mental state in issue: "When the issue of the mental state of a party to a custody suit is clearly in controversy, and a proper resolution of the custody issue requires disclosure of privileged medical records, the psychiatrist-patient privilege must yield." *Id.* There are several other Alabama intermediate appellate court decisions that have held similarly. *See Black v. Black*, 625 So.2d 450 (Ala.Civ.App.1993); *Harbin*, 495 So.2d 72. The Alabama cases are cited often by the courts of other states that have reached a similar holding.

The Indiana Supreme Court perhaps has gone further than any other court in holding that the mere filing of a custody action places a parent's mental health at issue, thus waiving the privilege for that proceeding and all subsequent custody proceedings. In *Owen v. Owen*, 563 N.E.2d 605, 608 (Ind. 1990), the court, in reversing the judgment of an intermediate appellate court, held:

Christine placed her mental condition in issue when she petitioned for and was granted custody under the original order, and that condition remains in issue for the purposes of custody questions during the children's minority. Therefore, her blanket assertion of the physician-patient privilege regarding her mental condition and treatment was not justified.

When a party-patient places a condition in issue by way of a claim, counterclaim, or affirmative defense, she waives the physician-patient privilege as to all matters causally or historically related to that condition, and information which would otherwise be protected from disclosure by the privilege then becomes subject to discovery.

In *Dawes v. Dawes*, 454 So.2d 311, 312–13 (La.Ct.App.), *writ denied*, 457 So.2d 18 (La.1984), the court held that a statutory enactment in respect to custody, passed after the date of passage of the privilege statute, created a specific exception to the privilege because it required the evaluation of the mental and physical health of the parents:

The hospitalization and prescription records which are maintained at DePaul and Oschner Hospitals appear to fall within the protective confines of this statute ["doctor/patient privilege"]. However, we hold that the doctor/patient privileges protected by R.S. 13:3734, et seq., are subject to the additional exception created by the subsequent enactment of the joint custody provisions of C.C. Art. 146 which specifically require the evaluation of the mental and physical health of the parents. The trial court has the power to preserve the confidentiality of this information by the usual methods of sealing the records, taking testimony in chambers, etc. as may be done in this case.

. . . .

... In reaching its conclusion [a Louisiana Supreme Court decision holding that the privilege was not waived in respect to the issue of separation], the Court reasoned that the legislature had not delineated separation suits as one of the exceptions to the doctor/patient privilege....

However, in this case we find that the plaintiff's physical and/or mental conditions are essential elements to his action for joint custody. That is, there exists a rebuttable presumption that joint custody is in best interest of the child. However, the presumption may be rebutted by a showing that it is not in the best interest of the child. In order to make such a showing, evidence may be introduced regard-

ing the fitness of the parent to care for the child, including among other factors, the moral fitness of the parties involved as well as the mental and physical health of the parties. [Citations omitted.]

Even in some of those states that have held that the mere seeking of custody places a parent's mental health at issue sufficient to operate as a waiver of statutorily enacted privileges, the courts sometimes impose limitations on the disclosure. In *Clark v. Clark*, 220 Neb. 771, 775, 371 N.W.2d 749, 752–53 (1985), the Supreme Court of Nebraska held:

As to the confidential relationship, if any, between Dr. Tatay and Mrs. Clark, she has waived any privilege she had in her conversations with Dr. Tatay by the filing of her petition alleging her fitness to have custody of her child.

As we have stated, we agree with the trial court that by placing her fitness to have custody of her child in issue, Mrs. Clark did waive any physician-patient privilege that existed between herself and Dr. Burlingame and between herself and Dr. Tatay. However, in view of the personal and confidential communications made between a patient and a psychiatrist (see *Taylor v. United States*, 222 F.2d 398, 401 (D.C.Cir.1955), " 'The psychiatric patient confides more utterly than anyone else in the world . . .' "), when a litigant seeks custody of a child in a dissolution of marriage proceeding, that action does not result in making relevant the information contained in the file cabinets of every psychiatrist who has ever treated the litigant. The determination as to the admissibility of the evidence to which the waiver applies is to be initially entrusted to the sound discretion of the trial court.

There is one case that appears to be in between the holdings of the two primary lines of cases. In *Kinsella v. Kinsella*, 150 N.J. 276, 325–30, 696 A.2d 556, 582–85 (N.J. 1997), the court appears to have held that such privileged treatment records were discoverable in child custody cases, but then used strong language discouraging such discovery.

However, by contesting custody or visitation, a parent does not automatically put information contained in records of therapy with such professionals "in issue." In regard to therapy records, which are at the heart of the psychologist-patient privilege, the courts must strike a balance between the need to protect children who are in danger of abuse or neglect from unfit custodians and the compelling policy of facilitating the treatment of parents' psychological or emotional problems.[12] Such a balance is in the best interest of the child.

Therefore, the first source of information about the parents' mental health should be the independent experts appointed by the courts or hired by the parties for the purpose of litigation, rather than the professionals who have established relationships with the parties. In most cases, the assistance provided by independent experts should be sufficient. Only when the court perceives, after consideration of all of the evidence, that the information gained from independent evaluations is inadequate, should the court consider piercing the psychologist-patient privilege to compel disclosure of prior treatment records to the court and the parties. The decision to order such disclosure must be based on independent evidence of potential for harm to the child, for example, the fact of a recent hospitalization, the opinion of an expert, or the court's own observations....

... Allegations alone, however, cannot be adequate to justify piercing the psychologist-patient privilege.

---

12. The medical history in a mental health situation relies on a patient's memory and many other mental processes, including fantasies, imaginational aspects, delusions, and other factors that are not objective in nature. Physical health situations rely, as we perceive it, primarily on more objective factors relating to past physical health characteristics. There would appear to be even more of a need for confidentiality in mental health situations than in physical health situations. For example, a physician can look at a compound fracture and see the bone piercing the skin—the injury is readily apparent. However, in many instances a psychiatrist or psychologist must delve into the mind and mental history of a patient to find the sources, and treatment, for the mental health problems presented—the injury or illness is not readily apparent.

*Id.* at 327–28, 696 A.2d at 583. After directing that the child custody issue be remanded to the trial court for it to conduct a balancing analysis between the competing interests the court went on to suggest to the trial court certain limitations it should utilize in that balancing process.

Courts should be mindful that, although New Jersey's psychologist-patient privilege is modeled on the attorney-client privilege, the public policy behind the psychologist-patient privilege is in some respects even more compelling. . . . The psychologist-patient privilege further serves to protect an individual's privacy interest in communications that will frequently be even more personal, potentially embarrassing, and more often readily misconstrued than those between attorney and client. Made public and taken out of context, the disclosure of notes from therapy sessions could have devastating personal consequences for the patient and his or her family, and the threat of such disclosure could be wielded to unfairly influence settlement negotiations or the course of litigation. Especially in the context of matrimonial litigation, the value of the therapist-patient relationship and of the patient's privacy is intertwined with one of the most important concerns of the courts—the safety and well-being of children and families. Therefore, only in the most compelling circumstances should the courts permit the privilege to be pierced.[13]

*Id.* at 329–30, 696 A.2d at 584.

Cases that hold that the mere filing of a custody action do not place a parent's mental and physical health at issue

---

**13.** One of the better comments on the importance of confidentiality of psychiatrist-patient communications is found in *Taylor v. United States,* 222 F.2d 398, 401 (D.C.Cir.1955), where, albeit in a criminal case, the court stated:

In regard to mental patients, the policy behind such a statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his

sufficient to waive the psychiatrist/psychologist/doctor-patient privilege include *Peisach v. Antuna,* 539 So.2d 544, 546 (Fla. Dist.Ct.App.1989), in which a father, among other things, sought custody of the minor child due to an allegation that his former wife was psychologically unstable and suffered from migraine headaches, which prevented her from being a fit parent. The wife admitted that she had received psychiatric treatment seven years earlier right after the divorce between the parties. Additionally, the wife was willing to undergo a current mental examination pursuant to the lower court's order. The husband sought to depose the psychiatrist who had treated the wife seven years before as well as three gynecologists who had treated her. The court opined:

> At issue, therefore, in custody modification proceedings are the parents' present circumstances.... Because the wife has agreed to submit to a psychological examination, the husband and the court will be adequately apprised of her present psychological condition.

> Moreover, the trial court's order ... runs afoul of the psychotherapist-patient privilege, section 90.503, Florida Statutes (1987). The husband claims that the wife waived that privilege by denying allegations of mental instability and stating that the short-term therapy seven years ago had made her an even better parent.... The husband's argument is without merit. Mere allegations that the custodial parent is mentally unstable are not sufficient to place the custodial parent's mental health at issue and overcome the privilege. Likewise, the custodial parent's denial of allegations of mental instability does not operate as a waiver of the patient-psychotherapist privilege. To hold otherwise would eviscerate the privilege; a party seeking privileged

---

entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand."

information would obtain it simply by alleging mental infirmity. [Citations omitted.] [Footnote omitted.]

*Id.* at 546; *see also Mohammad v. Mohammad*, 358 So.2d 610, 613 (Fla.Dist.Ct.App.1978) (holding that mere denial of mental instability does not operate to waive the privilege).

The Florida courts have further examined how a person places his or her mental condition in issue in a domestic case, albeit not a custody case, and in the process furnished an example of how mental condition is placed in issue. *Davidge v. Davidge*, 451 So.2d 1051, 1051–52 (Fla.Dist.Ct.App.1984), distinguishes between a specific assertion of a mental condition in support of a claim, from the general assertion of fitness typically made or implied in a child custody dispute. *Davidge* involved an attempt to get a property settlement agreement reopened on the grounds of the husband's mental capacity at the time of the execution of the agreement. The husband alleged that "he had been emotionally and mentally incapable of entering into a valid contract" at the time the agreement was made. *Id.* at 1051. At trial, he presented expert and lay opinions "concerning his mental condition before, during and after the time of execution of the agreement." *Id.* at 1051–52. The trial court, however, had refused to allow the wife to present testimony of a psychiatrist who had treated both her and her husband shortly before the execution of the agreement.

The appellate court first noted part of its opinion in *Roper v. Roper*, 336 So.2d 654 (Fla.Dist.Ct.App.1976), *cert. denied*, 345 So.2d 426 (Fla.1977), in which the issue of a party's mental condition was raised by an opposing party. "The trial court would be faced with an entirely different situation if the wife should offer the testimony of her treating psychiatrist to prove her mental condition. In that event the door would have been opened and the privilege waived." *Davidge*, 451 So.2d at 1052 (quoting *Roper*, 336 So.2d at 657). The Florida privilege statute had an exception similar to one of Maryland's present exceptions. It provided that there was no privilege for communications relevant to the mental condition of a patient in a proceeding "in which he relies upon the condition as an

element of his claim or defense." Fla. Stat. ch. 90.503 (1983). The court held that Mr. Davidge was relying specifically on his mental condition at the time the agreement was made in his attempt to get the agreement overturned, and had, accordingly, waived the privilege. *Id.*

In *State ex rel. Husgen v. Stussie*, 617 S.W.2d 414, 416–17 (Mo.Ct.App.1981), *superseded by statute as stated in Roth v. Roth*, 793 S.W.2d 590 (Mo.Ct.App.1990), the parties in a divorce proceeding were contesting the custody of three minor children. The wife sought mandamus relief in the appellate court in respect to discovery of certain of the husband's past and present psychiatric treatment. The Missouri privilege statute, Mo.Rev.Stat. § 491.060 (1978), afforded physician-patient protection. The husband alleged that his conduct had been exemplary. The court framed the issue: "The question thus raised is whether the husband, by seeking custody of the children, has placed his mental health in issue such that he has waived his physician-patient privilege." *Id.* at 416.

The wife relied on a statute that specifically stated that in custody matters the mental and physical health of all individuals involved was to be one of the factors in custody disputes. The court, adopting the position of the Florida courts, and essentially expressing the same concerns that Dr. Rappeport expressed in 1977 to the Maryland Senate Judicial Proceedings Committee in regards to Senate Bill 90, held:

> Thus, the *Roper* court held that the mere request of custody is not sufficient to waive the physician-patient privilege.
>
> An examination of the facts and law involved in this case reveals that the approach taken by the Florida court is the proper one. By merely seeking custody, the husband has not made his mental health an element of his claim or defense. The psychiatrist-patient relationship involves a high degree of candor not existent in other relationships. This relationship would be seriously compromised if one waives such a privilege whenever, regardless of degree, mental health is a factor. This does not mean that such

privilege cannot be waived in a child custody proceeding but there is no waiver here. . . .

Finally, the physician-patient privilege embodies the legislature's balancing of societal interests of confidentiality in furthering full disclosure [to the mental health provider] thereby facilitating treatment[,] and [the] interests served by disclosure of such information in court. If a new balance is to be struck in child custody cases, this is the proper role for the legislature and not for this court.

*Id.* at 416–17 (footnote omitted).

■■■ The Connecticut privilege statute involved in *Cabrera v. Cabrera,* 23 Conn.App. 330, 580 A.2d 1227 (1990), had an exception provision that applied "where a party introduces her psychological condition as an element of her claim or defense '*and* the judge finds that it is more important to the interests of justice that the communications be disclosed. . . .'" *Id.* at 335, 580 A.2d at 1231 (quoting Conn. Gen.Stat. § 52–146c (1990)). The wife had been counseled by marriage counselors and examined by psychologists for treatment purposes in the past, but had also been currently evaluated by a psychiatrist.[14] The evaluating psychiatrist did not have available to him the records of the previous mental health treatment of the wife. The trial court, however, credited the report of the evaluating psychiatrist, and awarded custody to the mother. On appeal, the father asserted that all of the prior mental health treatment records should not have been excluded pursuant to the privilege statute. He alleged that because the prior treating

---

**14.** Generally, when considering psychiatrist/psychologist-patient privilege issues in child custody matters, the term "treatment" refers to communications and records relating to a patient seeing a mental health professional for the purpose of determining whether the patient has a mental problem, and if so, a diagnosis of what the problem is, and what the proper course of treatment should be. In other words, a patient is seeking to be cured of a mental health problem the patient believes does, or possibly does, exist. The term "evaluation" of mental (or physical) health matters, in the context of child custody cases, refers to a process of examination to determine whether a problem exists and to report to the court the opinions of the evaluator as to the state of a person's mental health as it might relate to parental fitness. Though both involve mental examinations, the purposes of each is different.

mental health providers had shared some of the communications relating to their treatment of his wife with him as a part of that treatment, confidentiality had been destroyed and thus the privilege had been waived. The husband asserted other grounds for waiver, including that the wife had put her own mental health at issue by calling the evaluating psychiatrist to the stand. The court responded to this allegation by stating:

> It was the defendant [husband] himself who sought the introduction of the family relations report. It was that report that made an issue of the plaintiff's mental health and that entitled the plaintiff to introduce the testimony of her own expert, Zucker, to rebut it.
>
> . . . .
>
> The defendant's claim that the testimony of Joondeph [the treating mental health provider] should have been admitted because her [the spouse's] mental health was automatically at issue under §§ 46b–81 and 46b–82 is also unavailing. While it is true that the plaintiff's health, like that of the defendant, is automatically in issue under §§ 46b–81 and 46b–82, those sections do not either specifically or implicitly override the provisions of § 52–146c [the privilege statute]. Rather, as is the general rule in construing statutes that appear to be in conflict, we read them, whenever possible, so as to give effect to both. In this case, this is easily done.
>
> Although information about an individual's mental health may indeed be relevant to the award of alimony and the distribution of property, as it surely is to the award of custody, the sources of information are limited by the provisions of § 52–146c. . . . The provisions of §§ 46b–81 and 46b–82 do not, however, render the plaintiff's privilege unavailable in her communications with Joondeph.

*Id.* at 339, 341, 580 A.2d at 1233, 1234.

In the case *sub judice*, there is no conflicting statute. There has been no relevant statute enacted since the repeal of the statutory exception for child custody cases, which has created any subsequent provision for child custody cases

amounting to a statutory waiver of the privilege such as occurred in *Dawes*. To the extent it can be reasonably argued that the Maryland case law in child custody cases supports a parental mental and physical health requirement, it does not conflict with the Maryland statutory privilege, which controls one of the sources of information that would otherwise be available to the trial courts in determining the best interests of children.

This does not mean that the trial courts will never have access to such information. In many, if not most, cases the trial court will have some information. If, in a given case, a party has waived the privilege, that information will be available. If the trial court has before it past mental health treatment information voluntarily furnished by one parent tending to indicate parental fitness, but has no past mental health treatment information in respect to the other parent, because that parent has exercised a psychiatrist-patient privilege, the trial court will have to render its decision on the basis of the evidence it has before it. In some instances, the party exercising the privilege may be at a disadvantage because the portion of the party's own treatment records that is favorable to him or her may not be available to the trial court. Of course, the trial courts also have the option, in their discretion, to order current evaluations of the mental and physical health of the parents and children.[15] The trial court, of necessity, must render its custody decisions on the basis of the evidence before it.

None of the cases we have discussed, neither the Alabama nor the Florida lines of cases, have dealt with an important aspect of this issue that exists in Maryland. As noted, *supra*, prior to 1977 there existed an express exception in the relevant Maryland privilege statute. In 1977, the Legislature addressed that exception, and repealed it. As we perceive the

---

**15.** As indicated, *supra*, the Court of Special Appeals' judgment includes a remand to the trial court for it to order an independent psychological evaluation. That part of the judgment of the intermediate appellate court was not presented to us in the Petition for Writ of Certiorari.

balancing that occurred at that point, the Legislature made a policy decision that the importance of the need for confidentiality for mental health treatment communications, and the records generated in part by the communications, were of sufficient importance to outweigh any exception for child custody matters. We are unwilling to ignore that policy statement by holding to the contrary.

■ Moreover, as we view the differing points of view of the two lines of cases noted, *supra*, we perceive the Florida line, from the Florida cases mentioned to the Connecticut case of *Cabrera* to be more persuasive.[16] We accordingly hold that, while the mental and physical health of a party is an issue to be considered by the trial court, a person seeking an award of child custody that claims to be a fit parent, does not, without more, waive the confidential psychiatrist/psychologist-patient

---

**16.** There is a contempt case involving the compelled disclosure of treatment records of a juvenile that has held that the doctor-patient privilege did not preclude disclosure, but, nonetheless held that the records were not discoverable because compelled disclosure would violate the patient's constitutional right of privacy. In *In re "B"; Appeal of Roth*, 482 Pa. 471, 484, 485, 486, 394 A.2d 419, 425, 426 (1978), the Supreme Court of Pennsylvania ultimately held that:

> We conclude that in Pennsylvania, an individual's interest in preventing the disclosure of information revealed in the context of a psychotherapist-patient relationship has deeper roots than the Pennsylvania doctor-patient privilege statute, and that the patient's right to prevent disclosure of such information is constitutionally based. This constitutional foundation emanates from the penumbras of the various guarantees of the Bill of Rights, *Griswold v. Connecticut*, [381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)], as well as from the guarantees of the Constitution of this Commonwealth....

> The nature of the psychotherapeutic process is such that disclosure to the therapist of the patient's most intimate emotions, fears, and fantasies is required.... In laying bare one's entire self, however, the patient rightfully expects that such revelations will remain a matter of confidentiality exclusively between patient and therapist....

> We recognize that our holding may, in some cases, make it more difficult for the court to obtain all the information it might desire regarding members of the juvenile's family, or about the juvenile's friends, neighbors, and associates. The individual's right of privacy, however, must prevail in this situation.

We do not directly address the constitutional right of privacy aspects of this case as it is not necessary.

privilege in respect to her or his past mental health "diagnosis and treatment" communications and records. Fitness of parents is a fundamental and primary element of child custody litigation. It is present even if not stated. It is no more present when it is stated by one party or the other. An assertion that one is fit is merely an assertion that one meets the qualifications to be awarded custody. If it were the law in Maryland that anyone seeking custody of children specifically placed their mental condition in issue, there would be no psychiatrist-patient privilege in custody disputes. The Legislature clearly established a contrary public policy. It chose to preserve the privilege in custody cases. We answer petitioner's first question in the negative. In answering petitioner's first question in the negative, we, of necessity, answer her second question in the affirmative. There was no cross-petition for certiorari filed by respondent; therefore, our consideration is limited to the questions presented by petitioner.

It is necessary to remand the case to the Court of Special Appeals for a consideration of the issues it declined to address in its opinion. Under the circumstances, it may chose to await the result of the independent mental evaluation it has directed the trial court to order, and the subsequent reconsideration by the trial court of its custody determination after the trial court has available to it that evaluation. Realizing that the question of whether an independent evaluation is necessary is discretionary with a trial court and, given that the trial court had available to it four years of the mental health records of petitioner, the Court of Special Appeals may also want to reconsider that aspect of its judgment. Such a remand, given the positions of the parties, will almost surely result in additional appeals adding to the already tortuous process of this matter in the courts, to the potential detriment of all involved.[17]

---

17. We note again that this case was appealed prematurely by the husband to the Court of Special Appeals and dismissed by that court. Then the husband appealed again to that court after a final judgment

Concerning the two issues presented to us, we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART; CASE REMANDED TO THAT COURT FOR FURTHER CONSIDERATION OF THE OTHER ISSUES PRESENTED TO IT, BUT NOT ADDRESSED IN ITS OPINION; COSTS TO BE PAID BY RESPONDENT.**

had been rendered. It has been reviewed by this Court and reversed and remanded for consideration of unaddressed issues. It is possible that if the Court of Special Appeals remands the case to the trial court for an independent evaluation, the trial court's subsequent decision will again be appealed to the Court of Special Appeals. The decision of the Court of Special Appeals, whatever it may be, could be petitioned to this Court and reviewed again, and, perhaps, given the wealth of information the trial court had at its disposal at the time of the original hearing, reversed again by this Court. In short, we doubt there was reversible error on the part of the trial court in the first instance in choosing not to utilize an independent evaluation given the four years of records it had available, but do not reach the issue at this time because of the limitations of the certiorari questions.